UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAREK AHMED, | No. 17-cv-2095 (DLC) |
| Plaintiff, | |
| -against | |
| AMERICAN MUSEUM OF NATURAL HISTORY and SAMUEL TRAN, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. PROC. 56**

Christine L. Hogan
Ivie A. Guobadia
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Defendants*

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS .............................................................................. 2

    I.    Background ................................................................................ 2

    II.    Plaintiff Submits Two Sets of Conflicting Applications for a Code
Developer Position at the Museum ......................................... 4

    III.    The Museum Discovers Discrepancies in Plaintiff's Educational
Background, Which Leads to Its Decision to Rescind Plaintiff's
Conditional Offer of Employment ......................................... 5

    IV.    Despite Learning of the Rescission of His Offer, Plaintiff Continues to Try
to Get the Museum to Change Its Mind .................................. 7

    V.    The Museum Cancels the TEK, Inc. Vendor Agreement Because of
Concerns Over Data Security .................................................. 8

    VI.    Plaintiff Complains About Mr. Tran Only After His Offer Was Rescinded
and His Contract Was Terminated .......................................... 8

ARGUMENT .................................................................................................. 9

    I.    The Standard for Summary Judgment .................................... 9

    II.    Plaintiff's Title VII and NYSHRL Retaliation Claims Fail as a Matter of
Law ........................................................................................ 10

        A.    Plaintiff's Retaliation Claims Must Be Dismissed Because, as an
Independent Contractor, He Is Not Protected by Title VII or the
NYSHRL ........................................................................ 10

            1.    Factors 3, 4, 6, and 9 Are Irrelevant or Indeterminate and
Should Therefore Be Disregarded ............... 11

            2.    Nearly All Other *Reid* Factors Weigh In Favor of
Contractor Status .......................................... 12

            3.    Non-*Reid* Factors Also Point Toward Independent
Contractor Status .......................................... 15

        B.    Plaintiff's Title VII and NYSHRL Retaliation Claims Fail as a
Matter of Law Because He Cannot State a *Prima Facie* Case of
Retaliation or Prove Pretext ............................................ 15

i.

TABLE OF CONTENTS
(CONTINUED)

PAGE

1.   Plaintiff's Actions Do Not Rise to the Level of "Protected Activity" and He Fails to Demonstrate a Causal Connection...... 16

2.   The Museum's Offer Revocation and Contract Termination Decisions Were Based Upon Legitimate and Non-Discriminatory Reasons............................................................. 17

3.   There Is No Record Evidence That the Museum's Articulated Reasons Were Pretextual ......................................... 18

4.   Plaintiff's Likely Counter-Arguments Are Unavailing ............... 21

III.   Plaintiff's NYCHRL Retaliation Claim Fails as a Matter of Law as Well ......... 23

A.   The Court Should Not Exercise Supplemental Jurisdiction Over Plaintiff's NYCHRL Claims.................................................................... 23

B.   Even under NYCHRL's More Liberal Standard, Summary Judgment Is Still Warranted Because There Is Insufficient Record Evidence of Pretext................................................................................. 24

IV.   The After-Acquired Evidence Doctrine Bars Front and Back Pay Damages In this Case........................................................................................... 24

CONCLUSION.................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahmad v. Nassau Health Care Corp.*,
  234 F. Supp. 2d 185 (E.D.N.Y. 2002), *aff'd*, 71 Fed. App'x 98 (2d Cir. 2003)......................18

*Alvarado v. Nordstrom, Inc.*,
  685 Fed. App'x 4 (2d Cir. 2017)...........................................................................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................................9

*Aymes v. Bonelli*,
  980 F.2d 857 (2d Cir. 1992)...........................................................................................12, 14

*Bampoe v. Coach Stores, Inc.*,
  93 F. Supp. 2d 360 (S.D.N.Y. 2000).................................................................................16, 17

*Brierly v. Deer Park Union Free Sch. Distr.*,
  359 F. Supp. 2d 275 (E.D.N.Y. 2005) ....................................................................................17

*Caidor v. Potter*,
  2007 WL 2847229 (N.D.N.Y. Sept. 26, 2007) ......................................................................22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................................9

*Charley v. Total Office Planning Servs., Inc.*,
  202 F. Supp. 3d 424 (S.D.N.Y. 2016).....................................................................................23

*Clesi v. Zinc Corp.*,
  2001 WL 1223456 (N.D.N.Y. Oct. 11, 2001) ......................................................................11

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989)................................................................................................10, 11, 12, 15

*Del Castillo v. Pathmark Stores, Inc.*,
  941 F. Supp. 437 (S.D.N.Y. 1996)...........................................................................................17

*Dixon v. Int'l Fed'n. of Accountants*,
  416 Fed. App'x 107 (2d Cir. 2011)..........................................................................................24

*Eisenberg v. Advance Relocation & Storage, Inc.*,
  237 F.3d 111 (2d Cir. 2000)...................................................................................10, 11, 12

*Gentile v. Potter*,
    509 F. Supp. 2d 221 (E.D.N.Y. 2007) ................................................................17

*Ghirardelli v. McAvey Sales & Serv., Inc.*,
    287 F. Supp. 2d 379 (S.D.N.Y. 2003), *aff'd*, 98 Fed. App'x 909 (2d Cir. 2004) ...................18

*Greene v. Coach, Inc.*,
    218 F. Supp. 2d 404 (S.D.N.Y. 2002).................................................................25

*Griffin v. Ambika Corp.*,
    103 F. Supp. 2d 297 (S.D.N.Y. 2000).................................................................19

*Gurry v. Merck & Co., Inc.*,
    2003 WL 1878414 (S.D.N.Y. Apr. 14, 2003) .........................................................22

*Iverson v. Verizon Commc'ns*,
    2009 WL 3334796 (S.D.N.Y. Oct. 13, 2009) ........................................................22

*Johnson v. FedEx Home Delivery*,
    2011 WL 6153425 (E.D.N.Y. Dec. 12, 2011) .......................................................11

*Joseph v. Marco Polo Network, Inc.*,
    2010 WL 4513298 (S.D.N.Y. Nov. 10, 2010) (Cote, J.) ..................................15, 16

*Kaplan v. Multimedia Entertainment, Inc.*,
    2008 WL 686774 (W.D.N.Y. Mar. 10, 2008).........................................................22

*Kemp v. A&J Produce Corp.*,
    164 Fed. App'x 12 (2d Cir. 2005).....................................................................18

*Lara v. City of New York*,
    1999 WL 459803 (S.D.N.Y. June 29, 1999) (Cote, J.).............................................24

*Lee v. Glessing*,
    51 Fed. App'x 31 (2d Cir. 2002).......................................................................13

*Legeno v. Douglas Elliman, LLC*,
    311 Fed. App'x 403 (2d Cir. 2009)....................................................................10

*Martin v. Sprint United Mgmt. Co.*,
    273 F. Supp. 3d 404 (S.D.N.Y. 2017)................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................9

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)...............................................................................15, 24

*McKennon v. Nashville Banner Publ. Co.,*
    513 U.S. 352 (1995).........................................................................................25

*Meiri v. Dacon,*
    759 F.2d 989 (2d Cir. 1985)............................................................................21

*Nolley v. Swiss Reins. Am. Corp.,*
    857 F. Supp. 2d 441 (S.D.N.Y. 2012), *aff'd*, 523 Fed. App'x 53 (2d Cir. 2013)
    (Cote, J.)....................................................................................................20, 22

*Osborne v. Literacy Partners, Inc.,*
    2007 WL 2298354 (S.D.N.Y. Aug. 9, 2007)...................................................20

*Raneri v. McCarey,*
    712 F. Supp. 2d 271 (S.D.N.Y. 2010).............................................................24

*Reyes v. Krasdale Foods, Inc.,*
    945 F. Supp. 2d 486 (S.D.N.Y. 2013)...............................................................9

*Richardson v. Bronx Lebanon Hosp.,*
    2014 WL 4386731 (S.D.N.Y. Sept. 5, 2014)..................................................24

*Sellers v. Royal Bank of Canada,*
    2014 WL 104682 (Jan. 8, 2014), *aff'd*, 592 Fed. App'x 45 (2d Cir. 2015)............13

*South v. Cont'l Casualty Co.,*
    2017 WL 782909 (S.D.N.Y. 2017).................................................................23

*Tagare v. Nynex Network Sys. Co.,*
    994 F. Supp. 149 (S.D.N.Y. 1997)................................................10, 13, 14, 15

*Tone v. U.S. Postal Service,*
    68 F. Supp. 2d 147 (N.D.N.Y. 1999), *aff'd*, 242 F.3d 368 (2d Cir. 2000) ..............17

*Weber v. Tada,*
    589 Fed. App'x 563 (2d Cir. 2014)..................................................................19

*Ya-Chen Chen v. City Univ. of N.Y.,*
    805 F.3d 59 (2d Cir. 2015).............................................................................16

**Rules**

Federal Rules of Civil Procedure Rule 56 ..............................................................1, 9

Defendants The American Museum of Natural History (the "Museum") and Samuel Tran submit this Memorandum of Law in Support of their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff Tarek Ahmed is a software developer who worked through his own company, TEK, Inc., under contract with the Museum on discrete projects, and who mispresented his educational credentials on multiple resumes and job applications when applying for employment with the Museum. He accuses Defendants of failing to hire him as an employee and terminating his company's independent contractor agreement in retaliation for his complaint that Defendant Tran allegedly sexually harassed a female co-worker—a complaint found by the Museum following thorough review to be without basis. He brings claims under Title VII, New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"). His claims have no merit.

As an initial matter, Plaintiff's Title VII and NYSHRL claims fail because he was properly classified as an independent contractor working through his own incorporated company – not as a Museum employee – and thus beyond the reach of those laws.

Regardless, all of Plaintiff's retaliation claims, including his NYCHRL claim, fail because there is no connection between his complaint and the Museum's decision not to hire him or the termination of his company's independent contractor agreement. The Museum rescinded its conditional offer of employment to Plaintiff because he lied on his job application materials and during the Museum's pre-hire process. The decision to rescind – which was not even made by defendant Tran, but by the Museum's Chief Information Officer, Juan Montes, in consultation with the Museum's Human Resources Department – occurred *before* Plaintiff even complained about any alleged sexual harassment to the Museum's Human Resources Department. There is

no causal connection. The same is true of the decision to terminate the contract between Plaintiff's company and the Museum, which was also made by Montes following a phone call he received from a Museum colleague who expressed concern regarding risks to the Museum's digital security posed by Plaintiff.

As explained more fully below, this Court should dismiss Plaintiff's complaint in its entirety and grant summary judgment for Defendants.

### STATEMENT OF FACTS

### I.   BACKGROUND

The Museum is one of the world's preeminent scientific and cultural institutions. (*See* Defendants' Local 56.1 Statement of Material Undisputed Facts ("SMF"), ¶ 3).

Tarek Ahmed is a software developer and engineer who has been working in the field since 1997. (SMF ¶ 1). He worked as an employee for various companies from 1997 through 2005 before starting to freelance as an independent contractor in 2005. (SMF ¶¶ 17-19). At that point, Plaintiff started working for multiple companies on different projects, advertising his services through various websites, and purchasing his own tools and equipment, including various software development programs to further advance his freelance business. (SMF ¶¶ 19-23). Then, in 2008, Plaintiff formally incorporated a software development company called Joomp, Inc., with its own website, email address, business cards, and letterhead. (SMF ¶ 24).

Also in 2008, Plaintiff started providing software engineering services as an independent contractor to a software company called Door3. Plaintiff would work on various projects for different Door3 clients, customizing and developing code. (SMF ¶ 25). In approximately December 2013, the Museum engaged Door3 to design and implement new software for the Museum's ticketing kiosks, website, and mobile applications, which are based on an enterprise software application called Tessitura. (SMF ¶ 27). About a year-and-a-half into the project,

2

Plaintiff started working with the Museum on behalf of Door3, designing features and fixing bugs in the Museum's ticketing software. (SMF ¶¶ 28-29).

The Museum's Tessitura ticketing software went live in May 2015, but it continued to experience software bugs and deployment issues. (SMF ¶ 30). Door3 continued working for the Museum until the fall of 2015, but the Museum continued to experience issues. (SMF ¶¶ 31, 34). So, in February 2016, after learning that Plaintiff was looking for work, the Museum engaged Plaintiff's expert services through his company, TEK, Inc. (SMF ¶¶ 35-38). Plaintiff did not have to apply or be interviewed – he was offered a contract, which he accepted. (SMF ¶ 38).

As President of TEK, Inc., Plaintiff signed a vendor agreement that made clear that he was being engaged on a per-project basis as an independent contractor. (SMF ¶¶ 39-43). Before signing that agreement, Plaintiff negotiated his hourly rate for services from $90 to $95. To get paid, Plaintiff had to invoice the Museum on TEK, Inc.'s own letterhead. (SMF ¶ 46).

The Museum did not control Plaintiff's performance of services – a fact that Plaintiff readily admits. Instead, Plaintiff would inform the Museum how he would resolve each issue and then would do so in the manner he preferred. (SMF ¶ 52). At most, the Museum informed Plaintiff where the code he was working on should be deployed and tested; but it did not teach or instruct Plaintiff how to perform his services or how to use the software that he worked on. (SMF ¶ 53). In addition, the Museum put no constraints on Plaintiff regarding his arrival or departure times, working hours, or when he could take time off. (SMF ¶¶ 49-51).

The Museum, satisfied with Plaintiff's work, engaged TEK, Inc. for three more successive scopes of work, each of which were slated to last 27 days. (SMF ¶ 54). With these projects, Plaintiff actually lost money – he worked more hours than he billed (so he did not exceed the maximum amount set aside for that statement of work), making the amounts he was

paid a per-project rate instead of a per-hour rate. (SMF ¶ 56).

## II. PLAINTIFF SUBMITS TWO SETS OF CONFLICTING APPLICATIONS FOR A CODE DEVELOPER POSITION AT THE MUSEUM

In spring 2016, the Museum began discussions regarding the establishment of a full-time software developer position at the Museum, and on June 23, 2016, Defendant Samuel Tran, Director of System Administration for IT, and Juan Montes, the Museum's Chief Information Officer, approached Plaintiff to ask him if he wanted to apply. (SMF ¶¶ 6, 8, 57-58). Plaintiff said yes. (SMF ¶ 59). He applied for the position on July 21, 2016. (SMF ¶ 64).

As it turns out, the application materials that Plaintiff submitted were rife with mistakes. On his resume, Plaintiff stated that he received a "B.S. in Computer Science" from Long Island University ("LIU") in 1997 and graduated *summa cum laude*. (SMF ¶ 67). He also stated on his application that he earned a Bachelor's degree. (SMF ¶ 69). On his resume, Plaintiff claimed that he performed services under his TEK, Inc. business from 2015 to present (omitting reference to Door3 and Joomp, Inc.) and that he worked for Bunk1.com from 2000 to 2005. (SMF ¶ 68). All of these representations were wrong, despite Plaintiff certifying that "my statements on this form are true" when he submitted his application. (SMF ¶¶ 67-71).

Tran briefly reviewed Plaintiff's first application and was concerned that it was incomplete.[1] (SMF ¶ 72). Tran then emailed Plaintiff to advise him to revise his application materials because the Human Resources Department ("HR") would scrutinize them closely. (SMF ¶ 75). Tran also told Plaintiff a cautionary tale of a prior candidate who applied for a job but included inaccurate information in his application. (SMF ¶ 76). The Museum rescinded the candidate's offer as a result even though he had already moved from Florida to New York for the job. (SMF ¶ 74). Ironically, Tran warned Plaintiff not to do the same thing. (SMF ¶ 76).

---

[1] Mr. Tran did not realize the multiple errors Plaintiff made in his resume and application listed above. (SMF ¶ 67, 69).

4

On August 1, 2016, Plaintiff submitted a second application and resume because he was concerned that he would fail a background check on the basis of his first set of application materials. (SMF ¶ 77). This second set contained major differences from the first set, particularly regarding Plaintiff's education. (SMF ¶ 78). In the "Education" section of his resume, Plaintiff removed the words "B.S." and "graduated summa cum laude," replacing them with only "Long Island University, 1993-1997, Computer Science." (SMF ¶ 79). And, on his new application under Education Institutions, Plaintiff indicated that while he attended LIU for four years with a major in Computer Science, he did not graduate or obtain a degree. (SMF ¶ 80).

Tran, however, did not realize that Plaintiff had made all these new changes. (SMF ¶ 84). Once the second application and resume were submitted, Tran selected Plaintiff as the final candidate, which Montes had previously approved. (SMF ¶ 83). Accordingly, on August 5, 2016, Assistant Director of HR LaToya Young emailed Plaintiff his pre-employment paperwork, which included a conditional offer letter, employee data sheet, and background check authorization and release. (SMF ¶ 87). The conditional offer letter explicitly stated that the Museum's "offer is contingent upon satisfactory reference and background checks." (SMF ¶ 89).

## III. THE MUSEUM DISCOVERS DISCREPANCIES IN PLAINTIFF'S EDUCATIONAL BACKGROUND, WHICH LEADS TO ITS DECISION TO RESCIND PLAINTIFF'S CONDITIONAL OFFER OF EMPLOYMENT

On or about August 11, 2016, Plaintiff finally submitted his pre-employment paperwork. (SMF ¶ 90). While reviewing the paperwork, however, Young noticed that on Plaintiff's Employee Data Sheet, he put LIU and "Associate's Degree" under the highest level of education completed, but included no date of graduation. (SMF ¶¶ 91-92). Young asked Plaintiff if he graduated and Plaintiff responded that he did and that he had his Associate's degree. (SMF ¶ 93). Young then informed Plaintiff that he had to fill out the date of his graduation. When Plaintiff replied that he forgot the exact date, but thought it was in May or June 1995, Plaintiff and Young

5

agreed that Young would write in June 1, 1995. (SMF ¶¶ 94-96).

Subsequently, Young submitted Plaintiff's materials for a background check to the Museum's vendor, Intellicorp. (SMF ¶¶ 98-99). On August 19, 2016, Plaintiff's background check results came in. The results indicated that there was a discrepancy with Plaintiff's stated education – Intellicorp could not confirm with LIU that he had obtained an Associate's degree. (SMF ¶¶ 100-101). Young contacted Plaintiff, told him about the discrepancy, and suggested he go to LIU to get a copy of the degree itself or a formal letter stating that he received his degree. (SMF ¶¶ 102 - 103). Plaintiff volunteered that he might have a copy of the diploma at home, so Young also encouraged him to go home, find the diploma, and bring it to her.  (SMF ¶ 105).

After speaking to Plaintiff, Young called LIU directly to inquire about Plaintiff's degree. LIU informed her that they had no knowledge of awarding Plaintiff an Associate's degree in Computer Science in 1995. LIU also said that they have never actually awarded Associate's degrees in Computer Science, so it would be impossible for Plaintiff to have obtained one. (SMF ¶¶ 106 - 108). That same day, Plaintiff visited LIU, which confirmed that he had not earned an Associate's degree and that he did not have enough credits to earn his Bachelor's degree. Plaintiff communicated this to Young in a follow-up conversation. (SMF ¶ 109).

Young then told Tran and Montes what was going on with Plaintiff's background check – that she believed that Plaintiff had misrepresented his educational background on his application materials, and that in these types of circumstances, the Museum would rescind the offer. (SMF ¶¶ 110 - 112). Tran and Montes pushed back because they felt that Plaintiff was the best fit for the position and that rescinding the offer would disadvantage the Museum. (SMF ¶ 113). Young then sent an email to her supervisor, Daniel Scheiner, Vice President of HR, summarizing her investigation and stating her belief that Plaintiff was not credible. (SMF ¶¶ 114 - 118).

Following his conversation with Young, Montes called Plaintiff with Tran present. Montes asked Plaintiff, point-blank, "What happened?" (SMF ¶¶ 119 - 120). Plaintiff responded that Tran warned him to be very precise with what he included in his application materials. Plaintiff further stated that Tran told him about the applicant who had misrepresented his educational credentials and had lost his job offer. (SMF ¶ 121). Montes then asked Plaintiff if he graduated and if he had the degree that he said he had. Plaintiff replied that he was a few credits short of a Bachelor's degree, but that he had his Associate's degree. (SMF ¶¶ 122 - 123).

After speaking with Plaintiff and thinking about the circumstances surrounding the educational discrepancies, Montes called Young back. He told her that he had just spoken to Plaintiff, who he had admitted that he was several credits short of a degree, and that she was right regarding Plaintiff misrepresenting his educational credentials. At this point, Mr. Montes agreed with Young that the Museum should revoke Plaintiff's offer. (SMF ¶¶ 125- 126). Accordingly, on August 22, 2016, Young sent a follow-up email to Scheiner informing him that Montes has agreed with her decision to rescind. (SMF ¶¶ 127 - 128). Then, on August 23, 2016, Montes met with Plaintiff with Mr. Tran present and told him that the conditional offer of employment was rescinded. (SMF ¶¶ 125-29).

## IV.   DESPITE LEARNING OF THE RESCISSION OF HIS OFFER, PLAINTIFF CONTINUES TO TRY TO GET THE MUSEUM TO CHANGE ITS MIND

During the next two weeks, Plaintiff attempted to obtain some sort of documentation from LIU to address his background check issue even though the conditional offer had been rescinded. (SMF ¶¶ 134). On September 6, 2016, Plaintiff gave Young a letter from LIU that contained the following language: "This is to certify that Tarek Ahmed has completed all requirements for the Associates of Arts degree." Significantly, the letter did not state that Plaintiff had actually obtained the degree (and, in particular, a degree in Computer Science) –

Plaintiff, in fact, never was awarded one. (SMF ¶¶ 142 - 143). This did not stop Plaintiff from also emailing Catherine Devine, Chief Digital Officer, however, telling her he had an Associate's Degree and a letter from the LIU registrar to prove it. (SMF ¶ 144). When Montes and Young discussed the letter, they both agreed that it did not change the Museum's decision to rescind Plaintiff's conditional offer. Accordingly, on September 7, 2016, Montes had a conversation with Plaintiff in which he reaffirmed that there was no job offer.  (SMF ¶¶ 145-47).

## V.     THE MUSEUM CANCELS THE TEK, INC. VENDOR AGREEMENT BECAUSE OF CONCERNS OVER DATA SECURITY

On September 9, 2018, Plaintiff called Devine about the withdrawal of his offer. Devine felt that Plaintiff was very upset and speaking quickly and loudly. (SMF ¶¶ 148-150). After speaking with him, Devine became concerned about the safety of the Museum's data systems because of Plaintiff's data access rights. Consequently, she contacted Montes, informed him of the conversation she had with Plaintiff, and expressed her concerns that there was a risk to the Museum since she believed Plaintiff had the "keys to the code" and data, and would be capable of doing damage to the Museum's digital property. (SMF ¶¶ 151-52). After speaking with Devine, Montes decided to terminate Plaintiff's contract. (SMF ¶¶ 153).

## VI.    PLAINTIFF COMPLAINS ABOUT MR. TRAN ONLY AFTER HIS OFFER WAS RESCINDED AND HIS CONTRACT WAS TERMINATED

Back in the beginning of August 2016, Plaintiff and several IT employees attended an annual conference hosted by Tessitura, the maker of the ticketing application deployed by the Museum ("Tessitura Conference"). Over one month later – and only after the Museum rescinded Plaintiff's offer and terminated his contract – Plaintiff contacted Senior Director of HR Kala Harinarayanan to allege for the first time that Tran had sexually harassed a female employee (referred to herein as "Jane Smith") while at the Tessitura Conference.  (SMF ¶¶ 161-63).

In response, Harinarayanan investigated Plaintiff's claim. She interviewed Jane Smith,

Tran, and four other employees, and Scheiner interviewed one other person. Significantly, Jane Smith stated that she did not feel harassed by Tran and felt that he simply had too much to drink. She also stated that the day after, Tran came to her to apologize if he had said anything that was inappropriate. (SMF ¶¶ 164-172). At the end of the investigation, Harinarayanan determined that although Tran should be counseled regarding alcohol consumption at work events, he did not violate the Museum's anti-harassment policy. Scheiner agreed. (SMF ¶¶ 173-74).

<u>**ARGUMENT**</u>

**I.    THE STANDARD FOR SUMMARY JUDGMENT**

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." *Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486, 490 (S.D.N.Y. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

For Plaintiff to survive summary judgment, he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, he must produce sufficient *admissible* evidence from which a reasonable fact-finder could find in his favor. *Id. See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (holding that a plaintiff cannot escape summary judgment by presenting conclusory or speculative evidence; she must present "concrete evidence from which a reasonable juror could return a verdict in [her] favor"). Summary judgment is also warranted when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The undisputed evidence here – including Plaintiff's deposition testimony, Defendants'

supporting declarations, and the documentary evidence – all demonstrates that Plaintiff's retaliation claims cannot withstand summary judgment.

## II.     PLAINTIFF'S TITLE VII AND NYSHRL RETALIATION CLAIMS FAIL AS A MATTER OF LAW

### A.     Plaintiff's Retaliation Claims Must Be Dismissed Because, as an Independent Contractor, He Is Not Protected by Title VII or the NYSHRL

As an initial matter, Plaintiff's Title VII and NYSHRL claims fail because Plaintiff performed services as an independent contractor through a separate incorporated entity, TEK, Inc. It is well settled that Title VII and the NYSHRL's protections apply only to employees. *See Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000).

The seminal case for determining whether an individual has been properly classified under Title VII (and the NYSHRL) is *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989). *See also Tagare v. Nynex Network Sys. Co.*, 994 F. Supp. 149, 154, 159 (S.D.N.Y. 1997) ("The factors consulted in this [NYSHRL] analysis largely mirror those weighed in Title VII claims."). Per *Reid*, courts should consider the following non-exhaustive list of factors to guide a determination as to whether an individual is a contractor or employee:

1. the hiring party's right to control the manner and means by which the product is accomplished;

2. the skill/expertise required;

3. the source of the instrumentalities and tools;

4. the location of the work;

5. the duration of the relationship between the parties;

6. whether the hiring party has the right to assign additional projects to the hired party;

7. the extent of the hired party's discretion over when and how long to work;

8. the method of payment;

9. the hired party's role in hiring and paying assistants;

10. whether the work is part of the regular business of the hiring party;

11. whether the hiring party is in business;

12. the provision of employee benefits; and

13. the tax treatment of the hired party.

*Legeno v. Douglas Elliman, LLC*, 311 Fed. App'x 403, 405 (2d Cir. 2009). The "ultimate

determination as to whether a worker is an employee . . . is a question of law." *Eisenberg*, 237 F.3d at 115. Here, the vast majority of the factors support independent contractor classification.

### 1. Factors 3, 4, 6, and 9 Are Irrelevant or Indeterminate and Should Therefore Be Disregarded

In applying the *Reid* test, the Court first "must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of 'indeterminate' weight – that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor" of employee versus contractor status. *See Eisenberg*, 237 F.3d at 114. Here, these factors include numbers 3 (source of tools), 4 (location of work), 6 (additional projects), and 9 (hiring of assistants).

Factors 3 and 4, concerning the source of tools used and the location of work performed, respectively, are in equipoise due to the nature of Plaintiff's services. Plaintiff provided services on-site using Museum software and computer equipment due to the sensitive data security issues implicated by the work that his company performed. Moreover, TEK. Inc. was engaged to write code not only on Museum ticketing software, but also on kiosks physically located at the Museum. (SMF ¶ 47-48). Thus, these two factors neither weigh for nor against employee or independent contractor status. *See, e.g.*, *Clesi v. Zinc Corp.*, 2001 WL 1223456, at *4 (N.D.N.Y. Oct. 11, 2001) ("Often, independent contractors will complete their work off-site; however, in this instance, the nature of Ms. Clesi's work required that she undertake . . . [her] tasks on-site."); *Johnson v. FedEx Home Delivery*, 2011 WL 6153425, at *10 (E.D.N.Y. Dec. 12, 2011) (finding in that case it was "the nature of the work rather than the status of the workers as employees or independent contractors that dictate[d] where this work will take place").

Factor 6, whether the hiring party may assign additional projects to the hired party, is also in equipoise because each project on which Plaintiff worked through TEK, Inc. was either reflected in separate scopes of work under the independent contractor agreement or, in a small

number instances, agreed upon *ad hoc* by the Museum and Plaintiff without memorializing them in advance (although Plaintiff later invoiced the Museum through TEK, Inc. for those additional services). (SMF ¶¶ 54-55). In all cases, the work performed by Plaintiff was part and parcel to the overall software development services that TEK, Inc. was contracted to provide. (SMF ¶¶ 44, 55). *See Aymes v. Bonelli*, 980 F.2d 857, 863 (2d Cir. 1992) (right to assign other projects "carries less weight … because the delegation of additional projects to [plaintiff, a computer programmer] is not inconsistent with the idea that he was [defendant's] independent trouble shooter who might be asked to intervene as computer problems arose").

Factor 9, the hired party's role in hiring and paying assistants, is irrelevant because Plaintiff did not hire any assistants. *See Eisenberg*, 237 F.3d at 118 (holding the ninth factor to be irrelevant because "Eisenberg hired no one to assist her").

### 2.    Nearly All Other *Reid* Factors Weigh In Favor of Contractor Status

After disregarding irrelevant factors, the Court "is then required to assess each of the remaining factors." *Eisenberg*, 237 F.3d at 114. All but one of the remaining factors set out in *Reid* weigh in favor of independent contractor status here.

Factor 1, the hiring party's right to control the manner and means by which the work is accomplished, demands the greatest emphasis, although no single factor is dispositive. *See id.* Significantly, Plaintiff testified that the Museum did not tell him how to perform his services for each project. Instead, Plaintiff informed the Museum how he would resolve each issue and then did so in the manner he preferred. The Museum did not teach or instruct Plaintiff how to perform his services or how to use the software that he worked on.  (SMF ¶¶ 52-53). Plaintiff's control over the manner and means he used to achieve the end result set by the Museum pushes his classification firmly into proper status as an independent contractor. *See, e.g.*, *Lee v. Glessing*, 51 Fed. App'x 31, 33 (2d Cir. 2002) ("Lee conceded that although a patient's physician determined

whether he or she would have physical therapy, Lee 'was responsible for how therapy aides treated the patients and what form the treatment took, if it was adequate and safe.'"); *Tagare*, 994 F. Supp. at 157 (finding that even though plaintiff was supervised by defendant, it did not control the plaintiff's daily activities and plaintiff possessed considerable control over when, where, and how long to work).

Factor 2, the skill or expertise required, weighs in favor of independent contractor status because Plaintiff was specifically engaged to provide software developer services – a skilled trade – through TEK, Inc. as a result of his unique skillset and experience.  (SMF ¶¶ 18-29, 37, 43). *See Tagare*, 994 F. Supp. at 157 (finding the fact that a plaintiff "was hired for his specialized skills" to weigh in favor of contractor status).

Factor 5, the duration of the parties' relationship, supports independent contractor status because the Museum engaged TEK, Inc. to perform services for short-term projects, the longest being less than two months and others set at only 27 days each. Plaintiff's combined work with the Museum through TEK, Inc. lasted only six months. (SMF ¶¶ 39, 43, 54, 154). *See Sellers v. Royal Bank of Canada*, 2014 WL 104682, at *8-9 (Jan. 8, 2014) (holding proper contractor status under the NYSHRL, in part, because "[f]ive renewals of no more than three months each are indicia of an independent contractor status."), *aff'd*, 592 Fed. App'x 45 (2d Cir. 2015).

Factor 7, the extent of the hired party's discretion over when and how long to work, also supports an independent contractor determination because Plaintiff used his own discretion to determine when to arrive and leave the Museum each day, did not report his arrival or departure times, did not have to ask permission to leave the Museum's property, and did not request permission to take time off. (SMF ¶¶ 49-51). *See Tagare*, 994 F. Supp. at 157 ("[Plaintiff] possessed significant discretion over when, where, and how long to work. Consideration of this

related . . . factor indicated that [plaintiff] had greater autonomy than a regular employee.").

Factor 8, the method of payment, again, weighs in favor of contractor status because the Museum paid TEK, Inc. largely on a per-project basis, and did so only after receiving proper invoices.  (SMF ¶¶ 39, 43-44, 46, 54). *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 428 (S.D.N.Y. 2017) (payment on a per-service basis is "consistent with, and indeed typical of a relationship between a client and an independent contractor" (internal quotations omitted)).

Factor 10, whether the work is part of the regular business of the hiring party, supports contractor status. The Museum engaged TEK, Inc. because the required coding work was not something the Museum had the capability to do in-house. Moreover, the Museum, as a scientific and cultural institution, is not in the business of fixing computer software issues. (SMF ¶¶ 3, 35). *See Aymes*, 980 F.2d at 863 ("Because [defendant] is involved in the business of selling swimming pools . . . Aymes' programming was not done in the company's regular business.").

Finally, Factor 12, the provision of employee benefits, and Factor 13, the tax treatment of the hired party, both weigh in favor of independent contractor status. Plaintiff was not eligible to, and did not, receive any employee benefits from the Museum, and TEK, Inc. received a 1099 at the end of the year with respect to the services Plaintiff performed. (SMF ¶¶ 45, 159). *See Aymes*, 980 F.2d at 862 (failure of hiring party to pay or withhold taxes was "highly indicative that [hired party] was considered an outside independent contractor"); *Tagare*, 994 F. Supp. at 157 (plaintiff could not enroll in defendant's health care, life, pension, or disability plans).

Only Factor 11, whether the hiring party is in business, does not support independent contractor status because the Museum is a nonprofit educational corporation. (SMF ¶ 3).

### 3.    Non-*Reid* Factors Also Point Toward Independent Contractor Status

Finally, the Court should consider other facts outside the *Reid* factors that support or conflict with a finding of independent contractor status. *Tagare*, 994 F. Supp. at 158. Here,

multiple factors provide even further support that Plaintiff was not the Museum's employee. An independent contractor agreement reduced the terms of Plaintiff's services through his corporation to writing. (SMF ¶¶ 39, 42). *Id.* (referencing the written agreement between the parties to support the conclusion that Plaintiff was properly classified). In addition, the corporation through which Plaintiff engaged with the Museum, TEK, Inc., has a functioning website. (SMF ¶ 40). Plaintiff also had been working as an independent contractor for roughly 11 years before being engaged by the Museum. (SMF ¶¶ 19-32). He advertised his services through various websites and had purchased his own tools and equipment to advance his various software development businesses. (SMF ¶¶ 20-23, 33). Plaintiff was not prevented from working for other companies while working for the Museum, he did not have to submit a resume or be interviewed, and he negotiated his fees. (SMF ¶¶ 38-39, 46).

Here, the only conclusion that may be drawn from the undisputed evidence is that Plaintiff was properly classified as an independent contractor. This Court should award summary judgment for the Museum on Plaintiff's Title VII and NYSHRL claims.

### B.   Plaintiff's Title VII and NYSHRL Retaliation Claims Fail as a Matter of Law Because He Cannot State a *Prima Facie* Case of Retaliation or Prove Pretext

Even if the Court does not grant summary judgment on the basis of his independent contractor classification, Plaintiff's retaliation claims still fail. Retaliation claims under Title VII and NYSHRL are analyzed under the well-known *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) burden-shifting paradigm. *Joseph v. Marco Polo Network, Inc.*, 2010 WL 4513298, at *16 (S.D.N.Y. Nov. 10, 2010) (Cote, J.). First a plaintiff must establish a *prima facie* case of retaliation: (1) that he engaged in "protected activity," (2) which was known to the defendant, (3) who thereafter subjected him to a "materially adverse employment action," where (4) there was a "causal connection" between the protected activity and adverse action. *Id.* Second, the defendant

may simply "articulate a 'legitimate, non-retaliatory' reason for the allegedly retaliatory action." *Id.* Once the defendant does so, the burden switches back to the plaintiff to establish that defendant's stated reasons are a pretext. *Id.* More specifically, the plaintiff must establish but-for causation and produce evidence that "'the adverse action would not have occurred in the absence of the retaliatory motive.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 78 (2d Cir. 2015).

Given these requirements and the undisputed record evidence, Plaintiff's Title VII and NYSHRL retaliation claims must be dismissed.

### 1.   Plaintiff's Actions Do Not Rise to the Level of "Protected Activity" and He Fails to Demonstrate a Causal Connection

As an initial matter, Plaintiff cannot meet the *prima facie* requirements for his retaliation claim because he did not engage in any protected activity before offer revocation and contract termination. During his deposition, Plaintiff alleged that he witnessed Tran behaving inappropriately toward a female Museum employee at the Tessitura Conference, and that he pulled Tran away and told him that it was "not cool." He also alleges that he reiterated to Tran the next morning that Mr. Tran's behavior "wasn't cool" and that he told Tran to apologize to the female employee. (SMF ¶¶ 176-77, 187). Even assuming such allegations are true, Plaintiff's actions do not constitute protected activity.

Judge Rakoff's decision in *Bampoe v. Coach Stores, Inc.*, 93 F. Supp. 2d 360, 372 (S.D.N.Y. 2000), is on point. There, plaintiff alleged that in "response to a derogatory comment about Africans, plaintiff told [his supervisor] Bloom 'that such a remark was not appropriate.'" Plaintiff tried to argue that his statement to his supervisor was protected; however, the court disagreed. "A mere statement to the alleged antagonist, albeit a supervisor employed by a defendant, that comment was inappropriate does not rise to the level of 'protected activity' for a retaliation claim." *Id.*; *see also Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 438-39

(S.D.N.Y. 1996) ("[E]ven the broadest interpretation of a retaliation claim cannot encompass instances where the alleged 'protected activity' consists simply of declining a harasser's sexual advances . . . . [T]he knowledge of the harasser cannot fairly be imputed to his employer."). In the present case, Plaintiff's "not cool" comments are analogous to Bampoe's "not appropriate" comment. Accordingly, Plaintiff does not sufficiently allege pre-termination actions that rise to the level of protected activity under Title VII or the NYSHRL.

Without sufficient evidence of protected activity that occurred *before* his conditional offer was revoked and contractor agreement was terminated, the only potential protected activity Plaintiff can point to is his September 14, 2016 complaint to Kala Harinarayanan – a complaint made at least a week *after* his job offer revocation and contract termination. Thus, he cannot possibly demonstrate a causal connection between the events. This alone is fatal. *See Tone v. U.S. Postal Service*, 68 F. Supp. 2d 147, 153 (N.D.N.Y. 1999), *aff'd*, 242 F.3d 368 (2d Cir. 2000) ("Defendants' retaliatory action cannot take place before plaintiff engaged in a protected activity, so the retaliation claim must be dismissed."); *Gentile v. Potter,* 509 F. Supp. 2d 221, 239 (E.D.N.Y. 2007) (finding that complained of action could not be retaliatory when it occurred before complaint was filed). For these reasons, Plaintiff does not make out a *prima facie* case under Title VII and the NYSHRL, so his claims must be dismissed in full.

## 2. The Museum's Offer Revocation and Contract Termination Decisions Were Based Upon Legitimate and Non-Discriminatory Reasons

Assuming, *arguendo*, that Plaintiff could state a *prima facie* case, the burden shifts to the Museum to simply articulate a legitimate reason for the adverse actions. *See Brierly v. Deer Park Union Free Sch. Distr.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005) (stating that "the employer's burden … is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions … and [courts] may not sit as super personnel departments").

Here, Plaintiff alleges two adverse actions: the Museum's decisions to (1) revoke his conditional offer of employment, and (2) terminate his independent contractor agreement. First, Montes, in conjunction with HR, decided to rescind Plaintiff's conditional offer because he believed (and HR agreed) that Plaintiff deliberately misled the Museum regarding his educational credentials. (SMF ¶¶ 89-140). Perceived dishonesty during the job application process is a legitimate, non-discriminatory reason for an offer rescission. *See, e.g.*, *Ghirardelli v. McAvey Sales & Serv., Inc.*, 287 F. Supp. 2d 379, 390 (S.D.N.Y. 2003) (granting summary judgment because terminating an employee for exaggerating his qualifications constitutes legitimate business reason), *aff'd*, 98 Fed. App'x 909 (2d Cir. 2004); *Ahmad v. Nassau Health Care Corp.,* 234 F. Supp. 2d 185, 196 (E.D.N.Y. 2002) (ignoring plaintiff's explanations for omissions concerning his work history on his application because his omissions were nonetheless "clearly legitimate" justifications for termination), *aff'd*, 71 Fed. App'x 98 (2d Cir. 2003).

Second, regarding Plaintiff's independent contractor agreement, Montes decided to terminate the agreement because his colleague, Chief Digital Officer Catherine Devine, reported to him that she believed that Plaintiff may pose a threat to the Museum's data security. (SMF ¶¶ 148-53). Concerns regarding security are also legitimate, non-discriminatory reasons for adverse actions. *Kemp v. A&J Produce Corp.*, 164 Fed. App'x 12, 16 (2d Cir. 2005) (affirming summary judgment where "plaintiff's supervisor had felt threatened by plaintiff's tone").

### 3. There Is No Record Evidence That the Museum's Articulated Reasons Were Pretextual

Once the defendant provides a legitimate, non-retaliatory reason for its decision, as the Museum has here, the burden then switches back to the plaintiff to establish that defendant's stated reasons are mere pretext for retaliation. In the present case, there is simply no evidence that the Museum's decisions to revoke Plaintiff's offer and terminate his agreement "would not

have occurred in the absence of the retaliatory motive." *Alvarado v. Nordstrom, Inc.*, 685 Fed. App'x 4, 7 (2d Cir. 2017) (internal quotations omitted).

After-acquired evidence provides confirmation that the Museum's decisions were legitimate and not based on any retaliatory motive. *See Weber v. Tada*, 589 Fed. App'x 563, 568 (2d Cir. 2014) (holding that defendants could argue that "the after-acquired evidence of Weber's [misconduct] confirmed their suspicions that he mismanaged . . . finances"). Here, Plaintiff admitted during his deposition that the following statements on his first resume were incorrect: (1) he did not receive a Bachelor's degree from LIU, (2) he did not graduate *summa cum laude*, (3) he did not perform services through his TEK, Inc. business from 2015 to present, and (4) he did not work for Bunk1.com from 2000 to 2005.  (SMF ¶¶ 67-69).

Moreover, LIU has confirmed that it has never actually awarded an Associate's degree in computer science. (SMF ¶¶ 16,107-108). The fact that Plaintiff claimed for weeks that he did, in fact, have this degree when it was never even offered by his university is simply untenable. And, even after Plaintiff confirmed on September 6, 2016 that he did not actually have the degree, he *still* misrepresented that he was awarded the degree to other employees. In an attempt to excuse his misstatement, Plaintiff testified only that it "must be typo."  (SMF ¶¶ 158).

In addition, it is significant that Tran did not make either the decision to revoke Plaintiff's conditional offer or the decision to terminate his contract (SMF ¶ 153) and that Plaintiff does not accuse the actual decision-makers – Montes, Young, and Scheiner – of any retaliatory intent. *See Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 309 (S.D.N.Y. 2000) (considering who plaintiff accused of animus and who participated in the termination decision). In fact, it is undisputed that these decision-makers *did not know about Plaintiff's conversations with Tran* at the Tessitura Conference when they made their decisions, so it would be impossible for those decisions to

have been made due to any retaliatory motive. (SMF ¶¶ 181 - 182).

There is also clear documentary evidence that Tran's relationship with Plaintiff did not change after Plaintiff told him his actions towards Jane Smith were "not cool." The very next day, Tran texted Plaintiff, reminding him to submit his application materials to Human Resources. The day after that, Tran invited Plaintiff to join him and a colleague for breakfast. (SMF ¶¶ 187-189). These communications demonstrate that Tran had no intention of retaliating against Plaintiff for Plaintiff's comments to him at the Tessitura Conference. *Cf. Nolley*, 857 F. Supp. 2d at 462 (Cote, J.) ("[T]here is no direct evidence that retaliation played a role in the . . . [adverse actions]. In fact, evidence in the record points in the opposite direction.").

Notably, Plaintiff never once complained about retaliation while working as a contractor for the Museum, even after his conditional job offer was revoked. This cuts against a finding of pretext. *See Osborne v. Literacy Partners, Inc.*, 2007 WL 2298354, at *6 (S.D.N.Y. Aug. 9, 2007) (plaintiff's failure to utilize internal complaint procedures undermined her claim). And, when Plaintiff finally made a complaint regarding Tran's conduct at the Tessitura Conference, the Museum thoroughly investigated Plaintiff's claims, finding them to be unsubstantiated. Again, this cuts against a finding of pretext.

Lastly, Plaintiff's deposition testimony proves that even he does not believe that his independent contractor agreement was terminated because of what happened at the Tessitura Conference: "Q. What reason do you believe your contractor agreement was terminated? A. It's because I exposed Sam and Juan lying. Q. In what way? A. They said that they did not hear from HR, and they did. And when I cc'ed them on an email to HR, that's when Juan got, you know, lost his mind practically and he started yelling at me and then terminated." (SMF ¶ 191).

### 4.    Plaintiff's Likely Counter-Arguments Are Unavailing

In an effort to avoid summary judgment in the face of the undisputed facts, Plaintiff will

likely make several arguments to manufacture pretext. None have merit.

First, Plaintiff cannot show differential treatment or that the Museum inconsistently applied its unwritten policy that it does not hire applicants who it believes deliberately mispresented facts on their job applications. (SMF ¶¶ 73, 183-186). *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (finding no evidence of pretext where plaintiff "has offered no evidence suggesting that the INS's treatment of her differed from that accorded other non-Jewish employees; that the INS departed from its general policies in discharging her; or that non-Jewish persons on probation who acted similarly were retained"). In fact, Tran explicitly warned Plaintiff of this policy between the submission of his first and second applications, yet Plaintiff *still* conclusively misrepresented that he had obtained his Associate's degree on both his second application and the ensuing pre-hire employee data sheet. (SMF ¶¶ 75-76, 78-82, 90-97).

In addition, over the last five years, the Museum has rescinded roughly 20 offers due to perceived misrepresentations concerning academic credentials on employment applications. In instances where the Museum proceeded with hiring a candidate whose background check yielded educational discrepancies, the Museum investigated and either believed that each of the applicants (1) had a good faith belief that what they represented was correct, or (2) made a mistake and then corrected the error in later application paperwork, but before his/her background check came back. (SMF ¶¶ 184 - 186). None are similarly situated to Plaintiff, for whom the Museum did not have a good faith belief that what he represented about his Associate's degree was correct, and who never corrected the error for the Museum.

Second, Plaintiff may also argue that the Court should overlook his misrepresentations because they were innocent mistakes. Plaintiff's alleged justification for the errors on his application materials, however, is irrelevant. It is well settled that a plaintiff's subjective belief

that he did not misrepresent his educational history cannot rebut an employer's legitimate, non-retaliatory reason for taking an adverse action. *See, e.g.*, *Gurry v. Merck & Co., Inc.*, 2003 WL 1878414, at *7 n.9 (S.D.N.Y. Apr. 14, 2003) (holding plaintiffs "subjective belief that she did not misrepresent her employment history is insufficient to rebut defendants' legitimate nondiscriminatory reason."); *Kaplan v. Multimedia Entertainment, Inc.*, 2008 WL 686774, at *7 (W.D.N.Y. Mar. 10, 2008) (holding that plaintiff's "assertion that she did not knowingly violate the policy as she was unaware of the suspension of her license is not sufficient to rebut defendants' legitimate reason for her termination"); *Caidor v. Potter*, 2007 WL 2847229, at *8 (N.D.N.Y. Sept. 26, 2007) (finding plaintiff's subjective belief that he did not misrepresent his criminal record as insufficient to rebut legitimate nondiscriminatory reason).

Finally, Plaintiff may argue that the temporal proximity between the Tessitura Conference and his offer revocation and contract termination supports a finding of pretext. As an initial matter, temporary proximity alone is insufficient to prove pretext. *Iverson v. Verizon Commc'ns*, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Merely claiming temporal proximity . . . is not enough to show that [the employer's] reasons for termination were a pretext for discrimination."). Moreover, when an intervening event occurs "between the protected activity and the adverse employment action," any inference of causation between the two is defeated. *See Nolley v. Swiss Reins. Am. Corp.*, 857 F. Supp. 2d 441, 461-62 (S.D.N.Y. 2012), *aff'd*, 523 Fed. App'x 53 (2d Cir. 2013) (Cote, J.). Your Honor's affirmed decision in *Nolley* is directly on point. There, the plaintiff argued that two adverse actions occurred after he complained about discrimination. The Court held, however, that (1) there was no evidence the decision-maker knew about plaintiff's complaint, (2) "within a few weeks" of his discrimination complaint, the person he complained to "was recommending [him] as the 'perfect person'" for

the job, (3) the decision-maker's receipt of negative feedback about plaintiff acted as an intervening factor to break causation between the complaint and the first adverse action, and (4) a confrontation plaintiff had with another employee acted as an intervening factor to break causation between the complaint and his termination. *Id.*

Analogous facts exist in the present case. Here, the undisputed evidence shows that the decision-makers – Montes, Young, and Scheiner – did not know of Plaintiff's conversations with Tran at the Tessitura Conference when making their decisions. (SMF ¶¶ 181 - 182). Even if they did, their receipt of information indicating that Plaintiff misrepresented his credentials on his application acted as an intervening factor to break any causation between the events at the Tessitura Conference and offer rescission. And, Montes' receipt of information from Devine regarding her concern over data security acted as an intervening factor to break causation between the events at the Tessitura Conference and Plaintiff's contract termination.

Simply put, there is no evidence of pretext. The Court should grant summary judgment on Plaintiff's Title VII and NYSHRL retaliation claims.

## III.   PLAINTIFF'S NYCHRL RETALIATION CLAIM FAILS AS A MATTER OF LAW AS WELL

### A.   The Court Should Not Exercise Supplemental Jurisdiction over Plaintiff's NYCHRL Claims

As discussed above, Plaintiff is unable to establish a case for Title VII (and NYSHRL) retaliation. "[C]ourts regularly decline jurisdiction over NYSHRL and NYCHRL claims once the federal employment claims have been dismissed." *South v. Cont'l Casualty Co.*, 2017 WL 782909, at *9 (S.D.N.Y. 2017); *see also Charley v. Total Office Planning Servs., Inc.*, 202 F. Supp. 3d 424, 432 (S.D.N.Y. 2016) ("[D]istrict courts frequently decline to exercise supplemental jurisdiction over state employment discrimination causes of action when the federal claims have been resolved . . . .").

23

Here, as it did in *Lara v. City of New York*, 1999 WL 459803, at *7 (S.D.N.Y. June 29, 1999) (Cote, J.), the Court should decline jurisdiction over Plaintiff's NYCHRL retaliation claim and dismiss it without prejudice to refile in state court.

**B.     Even under NYCHRL's More Liberal Standard, Summary Judgment Is Still Warranted Because There Is Insufficient Record Evidence of Pretext**

Assuming, *arguendo*, that the Court decides to exercise its supplemental jurisdiction over Plaintiff's NYCHRL claim, it still fails.[2] While the but-for causation standard does not apply to NYCHRL retaliation claims, during the pretext stage of the *McDonnell Douglas* burden shifting analysis, a plaintiff  must still establish a causal connection between his protected activity and an "action that would be reasonably likely to deter a person from engaging in a protected activity." *See Dixon v. Int'l Fed'n. of Accountants*, 416 Fed. App'x 107, 110 n.1 (2d Cir. 2011); *Richardson v. Bronx Lebanon Hosp.*, 2014 WL 4386731, at *10 (S.D.N.Y. Sept. 5, 2014).

Here, as explained above, no such causal connection exists, so the Court should grant summary judgment upon Plaintiff's NYCHRL retaliation claim as well. *Dixon*, 416 Fed. App'x at 110-11 (affirming summary judgment on plaintiff's NYCHRL retaliation claims because plaintiff failed to "identify any evidence, apart from temporal proximity, to suggest that this reason was pretextual.").

**IV.     THE AFTER-ACQUIRED EVIDENCE DOCTRINE BARS FRONT AND BACK PAY DAMAGES IN THIS CASE**

Plaintiff seeks to recover front pay and back pay damages from September 2016 to present. The after-acquired evidence doctrine, however, bars front pay and limits back pay when evidence of an employee's misconduct – discovered after the employee's termination – is "of

---

[2] As a separate matter, Plaintiff's aiding and abetting claim against defendant Tran automatically fails because Tran cannot aid and abet his own conduct. Courts regularly grant summary judgment on aiding and abetting claims on this basis. *See, e.g.*, *Raneri v. McCarey*, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) (granting summary judgment on aiding and abetting claim because "[a]n individual cannot aid and abet his own alleged discriminatory conduct.").

such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362-63 (1995); *see also Greene v. Coach, Inc.,* 218 F. Supp. 2d 404, 412 (S.D.N.Y. 2002) (granting defendant's motion to limit plaintiff's damages that plaintiff lied on her employment application about her educational credentials). Specifically, this doctrine limits back pay remedies to the time period between the date of the employee's discharge and the date the after-acquired evidence was discovered. *McKennon*, 513 U.S. at 363.

Here, like the plaintiff in *Greene v. Coach, Inc.*, Plaintiff made multiple misrepresentations on the resume he submitted with his first application regarding receipt of a Bachelor's degree, graduating *summa cum laude*, and the time periods during which he worked for certain employers. (SMF ¶¶ 66-70). Pursuant to the Museum's policies and the instructions and statements on the employment application itself, deliberate misrepresentations are not tolerated and will lead to termination. As such, the after-acquired evidence doctrine bars the Plaintiff's front pay claim and limits his back pay recovery to the time period between the date of the contract termination (September 9, 2016) and the date that the after-acquired evidence was discovered (September 21, 2016). (SMF ¶¶ 74).

## CONCLUSION

Based on the foregoing, Defendants respectfully requests that the Court grant their motion for summary judgment in its entirety and dismiss Plaintiff's Complaint as a matter of law, and order such other and further relief as the Court deems just and proper.

Date:   May 2, 2018
        New York, New York

*s/Christine Hogan*
_____

Christine L. Hogan
Ivie A. Guobadia
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Defendants*