UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                      :           17cv2095(DLC)

TAREK AHMED,
                        Plaintiff,    :      OPINION AND ORDER
                                        :

                -v-                 :
                                         :
AMERICAN MUSEUM OF NATURAL HISOTRY and :
SAMUEL TRAN,                             :
                                         :
                        Defendants.   :
                                         :
------------------------------------ X

APPEARANCES:

For the Plaintiff:
Lauren Goldberg
Law Offices of Lauren Goldberg, PLLC
65 Broadway, 7th Floor
New York, NY 10006
646-452-8380


For the Defendants:
Christine L. Hogan
Ivie A. Guobadia
Littler Mendelson, P.C.
900 Third Avenue
New York, NY 10022
212-583-9600


DENISE COTE, District Judge:

     Plaintiff Tarek Ahmed, a software developer who worked

under contract for defendant the American Museum of Natural

History (the "Museum"), alleges that the Museum and Samuel Tran,

his supervisor at the Museum, retaliated against him in

violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000a et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law § 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").  The defendants have moved for summary judgment.  For the reasons below, the motion is granted.

## Background

The following facts are undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted.  Ahmed has been a software developer and engineer since 1997.  Ahmed worked on and off as an independent contractor for a software company called Door3 from 2008 to the beginning of 2016.  Around December 2013, the Museum engaged Door3 to design and implement new software for the Museum's ticketing kiosks, website, and mobile applications.  Around July 2014, Ahmed joined this effort as an independent contractor for Door3.  The software program Ahmed was working on, Tessitura, went live in May 2015, after which the Museum continued to engage Door3 to troubleshoot various software bugs and deployment issues until the Fall of 2015.

Ahmed left Door3 in early 2016, and in January 2016, reached out to the Museum's Director of Digital Technology to inform her that he was looking for work.  It turned out that at that time, the Museum had decided to dedicate approximately

$25,000 to improve Tessitura.  In March 2016, Ahmed, through the new company he formed, TEK, Inc., contracted with the Museum pursuant to a Vendor Agreement to "provide technical consulting, development services, quality assurance testing and deployment implementation support for the Museum's ticket application." The Vendor Agreement stated that TEK, Inc. was being engaged in its capacity as an independent contractor and set a completion date of April 30, 2016.  Ahmed signed the Vendor Agreement as President of TEK, Inc.

Defendant Tran, Director of System Administration in the Information Technology Department at the Museum, oversaw management of certain IT infrastructure, e.g., servers and storage devices, and managed the virtualization services.  Tran was one of Ahmed's supervisors at the Museum.  Juan Montes, the Museum's Chief Information Officer, served as Tran's direct supervisor and oversaw the Museum's technical operations.  Ahmed was also supervised by Susan Weisbrod, the Tessitura Project Manager at the Museum, and was expected to update Weisbrod on the status of his work at least twice a week.

Ahmed was also required to work physically at the Museum every day with the laptop and desk purchased for or assigned to him by Tran.  According to Ahmed, he was also expected to be at the Museum while the Museum was open and the other members of the IT staff were present and to attend certain employee only

3

meetings with other Museum employees.  While Ahmed was not
required to report when he arrived or ask permission to leave,
he felt that if he was absent without an explanation, he would
have faced consequences.

Some of Ahmed's tasks under his agreement with the Museum
were to fix a Tessitura application bug; complete school group
ticketing enhancements, insert e-commerce reporting, and
encapsulate and streamline the application deployment process.
Satisfied with the work, the Museum engaged TEK, Inc. with three
successive scopes of work after April 2016: (1) a project
beginning in May 2016 to enhance the software in the Museum's
in-house ticketing kiosk; (2) a project beginning in June 2016
to upgrade the ticketing software and develop software to sell
tickets to an upcoming film festival online; and (3) a project
beginning in August 2016 to upgrade the new software and provide
school group fixes/enhancements, and add accessibility
enhancements.  There were times, however, when plaintiff
performed projects on an ad hoc basis that were not contained in
the scope of work to which he had agreed with the Museum.

In the Spring of 2016, the Museum began discussions
regarding establishing a full-time software developer position
at the Museum.  Ahmed indicated his interest in the position in
or about April 2016.  On or around June 23, 2016, Montes and
Tran approached Ahmed to ask whether he wanted the position, and

he answered affirmatively.  Human Resources ("HR") required a formal process to be followed to hire a new employee.  Tran enlisted Ahmed's help to draft certain portions of the job description by providing a list of what technologies would be necessary for the position.  The written job description required a Bachelor's Degree in Computer Science, Information Technology, or a related field.  The Museum's management approved hiring someone for the position on July 18, 2016.

On July 21, 2016, Ahmed submitted the first of two applications for the position.  In the first application, Ahmed did not enter a school or any details, but entered "Bachelor's" under "Educational Institutions/Degree Type" with no graduation date.  On the resume he submitted, Ahmed incorrectly stated that he received a B.S. in "Computer Science" from Long Island University ("LIU") in 1997 and graduated summa cum laude.  The resume also erroneously indicated that Ahmed had performed services under his TEK, Inc. business since 2015 and that he worked for a website, Bunk1.com, from 2000-2005.

Tran viewed Ahmed's application and was concerned it was incomplete.  Tran advised Ahmed that HR would look at his application closely, and it needed to be filled out completely and as accurately as possible.  Tran advised Ahmed about a prior candidate who had applied for a job, but had placed inaccurate information in his application.  The Museum rescinded the job

offer even though the candidate had moved a great distance to work for the Museum.

On August 1, 2016, Ahmed submitted a second cover letter, application, and resume to replace his first set of materials. He did so because he was concerned he would fail a background check on the basis of the first set of materials. In this second application, Ahmed changed the education section of the application to read, "Long Island University, 1993-1997" with a major in Computer Science, but stated that he did not graduate. On his resume, Ahmed changed his work experience to state that he had worked at TEK, Inc. from 2005 even though TEK, Inc. was incorporated in 2016. Ahmed claims that he did not spend much time on his application because Tran constantly told him that the job was his.

That same day, Tran, who claims that he did not review Ahmed's second set of application materials, selected Ahmed as the final candidate for the software developer position, triggering an automatic email to Ahmed from the Museum, which stated that offers were contingent on a successful reference check and background check.

Meanwhile, Ahmed was instructed to go to the Tessitura conference in Washington, D.C., from August 7-11, 2016 along with other Museum employees. The Museum paid for his attendance and travel expenses. One night, at the conference, Ahmed

witnessed Tran, who appeared to be drunk, make sexual advances towards a female coworker. Ahmed proceeded to pull Tran away from the coworker and told him that his behavior was "not cool." The next morning, Ahmed recalls telling Tran that "it really wasn't cool what happened last night" and suggested that Tran apologize to the female co-worker, who "didn't seem like herself." Tran does not remember acting this way on the night in question, or Ahmed's comments to him.

On August 11, when Ahmed returned from the conference, he completed the pre-employment paperwork and returned it to LaToya Young, the Museum's Assistant Director of Employment in the HR Department. The documents included an employee data sheet and background check authorization and release. Young reviewed the documents in her office with Ahmed. Young noticed that Ahmed entered his highest level of education as an Associate's degree from Long Island University, and again, did not include a date of graduation. When Young asked Ahmed about the missing date, Ahmed told her that he was not sure of the date but that it was probably 1995 or 1996. According to Ahmed, Young took it upon herself to write June 1, 1995 onto the employee data form. Young also noticed that, based on his response on the employee data sheet, Ahmed did not meet the Bachelor's degree requirement stated in the job posting. Young submitted Ahmed's materials

for a background check pursuant to standard Museum procedure in order to determine his actual academic background.

On August 19, Young along with others in HR received an email from Michael Goun, the Museum's then-Director of Revenue Security and Investigations with the results of the background check conducted by private vendor Intellicorp. The email stated: "Candidate cleared pre-employment screening except for education and prior employments. . . . Education – Long Island University – database used by school unable to confirm Associate's degree."

Young then called Ahmed to inform him of the results and that he could either get a copy of the degree itself or a formal letter from his university's Registrar Office stating that he received his degree. When Young contacted LIU directly to inquire about Ahmed's degree, she was told that LIU had never awarded Associate's degrees in Computer Science. That same day, August 19, Ahmed visited LIU to inquire about the Associate's degree. He was told that he did not have enough credits to earn his Associate's degree.[1] LIU never conferred an Associate's degree in Computer Science on Mr. Ahmed.

---

[1] This was apparently a mistake on the part of the LIU registrar, because he later received a letter from LIU indicating that he had completed "all requirements" for an Associate's degree.

During a telephone conversation with Tran and Montes later that day to discuss Ahmed's application, Young told both of them that she believed that Ahmed misrepresented his educational background on his application materials.  Young told Montes and Tran that the normal procedure in this circumstance would be to rescind the job offer.  Montes was distressed by the news.

Montes informed Young that Ahmed's work was critical to several projects at the Museum and that delaying his hire or rescinding his job offer would be a considerable disadvantage to the Museum.  Young relayed that message to her supervisor. Because Montes still wanted to hire Ahmed at this point, Young recommended that Ahmed be interviewed by two members of the HR department for a further credibility analysis.

Following this conversation with Young, Montes and Tran spoke by telephone with Ahmed that day.  The content of that conversation is disputed but the parties agree that the clearance issue was discussed.  Tran remembers having a conversation with Montes in which Montes informed Tran that he had decided not to continue to pursue Ahmed's hire.  Either that Friday, August 19, or the following Monday morning, they called Young back and Montes informed her that he now agreed with her assessment that plaintiff was misrepresenting his educational credentials.  By this point, Montes believed that the Museum should revoke the offer of full-time employment.

Three of Ahmed's coworkers have testified that they noticed tension between Tran and Ahmed.[2]  One colleague testified that he noticed increased tension between Tran and Ahmed during Ahmed's final weeks at the Museum and that he believed this tension began before the Tessitura conference.  He also told Ahmed that he believed Tran was trying to derail Ahmed's hire.  Another colleague also told Ahmed that she felt Tran may have derailed Ahmed's job offer.  She suspected this was because Tran "might have been a little intimidated by Tarek's familiarity and knowledge of" the Tessitura application.  A third colleague indicated in testimony that after Ahmed's background check she became aware of "issues" between Ahmed, Tran, and Montes, and felt that they were not getting along well.

On Monday, August 22, Young sent out an email calling off the interviews by the two members of the Museum's Human Resources team.  That same day, Ahmed sent an email to Tran and Montes inquiring about his start date, to which Montes responded that he will have an update the following morning.  On August 23, Ahmed met with Montes and Tran.  They informed him that the conditional offer of employment was rescinded, but that the Museum would continue to work with him as an independent contractor.

---

[2] This testimony is recited without analyzing the extent to which it might constitute admissible trial testimony.

Ahmed tried to resolve the situation by continuing attempts to verify that he had earned an Associate's degree. According to Ahmed, Young told him that all Ahmed needed to clear the background check was a letter from his University indicating that he had the requisite credits for the Associates degree. On September 6, 2016, Ahmed provided Young with a letter from LIU stating: "This is to certify that Tarek Ahmed has completed all requirements for the Associates of Arts degree." Ahmed then emailed the Museum's Chief Digital Officer, to inform her that he had proof of his Associate's degree.

On September 9, Ahmed asked Montes whether he had received anything from HR regarding his job offer and Montes said he had not. Ahmed then sent an email to HR, copying both Montes and Tran, inquiring about the status of his job offer following his production of the LIU letter. According to Ahmed, within a minute or so after Ahmed sent the email, Montes came out of his office and began yelling and screaming at Ahmed. Feeling hostility from both Tran and Montes, Ahmed decided to leave the Museum for the rest of the day.

Upon leaving work, a distressed Ahmed called the Chief Digital Officer to discuss the rescission of his conditional offer. That officer explains that, while she did not think that Ahmed was directing any anger at her, she felt that he was very upset, speaking quickly and loudly. Following their

conversation, she expressed concern to Montes that there may be a risk to the Museum because she believed Ahmed had the keys to code and data and, in his discontent, could willfully damage the Museum's digital property.  Montes made the decision to terminate the Museum's contract with TEK, Inc.  Ahmed does not deny that he was upset and would have sounded so, but explains that the only reason he sounded upset was because he was still on edge from his encounter with Montes less than half an hour prior to the telephone call.  That evening, Ahmed received an email from Montes terminating the Museum's contract with TEK, Inc.

Following the termination of the TEK, Inc. contract, around September 14, Ahmed reported for the first time his allegations that Tran had sexually harassed a fellow employee at the August conference.  He made this report to the Museum's Senior Director of HR.  After an internal investigation, the Museum decided that although Tran should be counseled for drinking too much at the conference, he did not violate the Museum's anti-harassment policy.

Ahmed filed a charge with the Equal Employment Opportunity Commission, and received a right to sue letter on February 23, 2017.  On March 23, 2017, Ahmed filed this lawsuit against the Museum and Tran, primarily claiming unlawful retaliation for opposing discrimination on the basis of sex in violation of

Title VII, NYSHRL, and NYCHRL.  Following discovery, on May 2, 2018, defendants moved for summary judgement.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cty. Of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Gemmink v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015).  Once the moving party has asserted facts sufficient to carry its burden of production, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted).

In the context of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). Ultimately, as in all cases, the test for summary judgment is whether "a reasonable jury could return a verdict for the nonmoving party." Nunn v. Mass. Cas. Ins. Co., 758 F.3d 109, 114 n.4 (2d Cir. 2014) (citation omitted).

I.   Federal and State Retaliation Claims

Title VII makes it unlawful for an employer "to discriminate against any employee or applicant because that individual opposed any practice made unlawful by Title VII." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted). "This anti-retaliation provision is intended to further the goals of [Title VII] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees." Id. (citation omitted).

The Supreme Court has explained that a broad interpretation of Title VII's retaliation provision furthers the overall purpose of the statute:

> Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses. . . . Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends.

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).

Title VII and the NYSHRL generally "cover 'employees,' not independent contractors." Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 113 (2d Cir. 2000). Whether a person is properly considered an "employee" for Title VII purposes is determined through a fact-specific, thirteen-factor test articulated by the Supreme Court in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989). These factors are:

> the hiring party's right to control the manner and means by which the product is accomplished[;] ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Id. at 751–52.  This list of factors is "non-exhaustive."

Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 227 (2d Cir.

2008), as amended (Apr. 22, 2008).  The first factor, which

examines the "extent to which the hiring party controls the

'manner and means' by which the worker completes her assigned

tasks," is the "most important factor in determining the

existence of an employment relationship."  Id. at 227, 228

(citation omitted).  Where the adverse employment action at

issue in a Title VII claim is an employer's failure to hire an

individual, that individual need not be an employee.  42

U.S.C.A. § 2000e-3(a)(prohibiting employers from discriminating

against "employees or applicants for employment" because they

have opposed unlawful employment practices).

    Courts in this Circuit analyze Title VII and NYSHRL

retaliation claims under the burden-shifting standard set out in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See

Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013).  Under

the McDonnell Douglas standard, a plaintiff establishes a prima

facie case of retaliation by making "four showings: that (1) she

engaged in a protected activity; (2) her employer was aware of

this activity; (3) the employer took adverse employment action

against her; and (4) a causal connection exists between the

alleged adverse action and the protected activity."  Id.

(citation omitted).  "Once the plaintiff has established a prima

facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013). If the defendant articulates a non-retaliatory reason, the plaintiff has the burden to prove that the retaliation was a "'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." Id.

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees ... because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). For a plaintiff to establish that he was engaged in protected activity, the first prong of a prima facie case of retaliation, "the plaintiff need only have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006) (citation omitted). Protected activity need not consist of a formal complaint of discrimination, rather, an "internal complaint to company management" can constitute a protected activity under Title VII. Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992).

An adverse employment action in the retaliation context is one that "well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination."  Burlington,

548 U.S. at 68 (citation omitted).  This category of actions is

broad and "extends beyond workplace-related or employment-

related retaliatory acts and harm."  Id. at 67.

A plaintiff may demonstrate a causal connection between the

protected activity and the adverse employment action

> (1) indirectly, by showing that the protected activity
> was followed closely by discriminatory treatment, or
> through other circumstantial evidence such as
> disparate treatment of fellow employees who engaged in
> similar conduct; or (2) directly, through evidence of
> retaliatory animus directed against the plaintiff by
> the defendant.

Hicks, 593 F.3d at 170 (citation omitted).  "An intervening

event between the protected activity and the adverse employment

action may defeat the inference of causation where temporal

proximity might otherwise suffice to raise the inference."

Nolley v. Swiss Reinsurance Am. Corp., 857 F. Supp. 2d 441, 461

(S.D.N.Y. 2012), aff'd sub nom. Nolley v. Swiss Re Am. Holding

Corp., 523 F. App'x 53 (2d Cir. 2013) (citing cases).

Ahmed's two retaliation claims both stem from the same

allegedly protected activity.  Ahmed claims that the Museum

retaliated against him for his actions and statements at the

Tessitura conference, namely pulling Tran away from a female

coworker and telling him that his behavior towards her was "not

cool" and his reiteration to Tran the following day that "it

really wasn't cool what happened last night."  It will be

assumed for the purposes of the analysis that follows that Ahmed's statements to Tran constituted protected activity.[3]

Ahmed challenges two adverse employment actions as unlawful retaliation. First, the Museum's failure to hire him for the permanent position and, second, the Museum's termination of his company's contract with the Museum. Both actions constitute materially adverse employment actions and may properly form the basis of retaliation complaints. Both claims fail, however, because Ahmed has not sufficiently demonstrated a causal connection between these actions and the claimed protected activity to raise a question of fact that would permit a rational fact finder to infer the requisite retaliatory motive.

A. Failure to Hire

Ahmed's first claim is that the Museum failed to hire him as a full-time software developer at the Museum in retaliation for his statements and actions opposing Tran's sexual advances towards a female coworker at the Tessitura conference. Because failure-to-hire claims do not require an employment relationship, regardless of whether Ahmed should be considered

---

[3] The Second Circuit has held that complaints made to the allegedly discriminating actor about the actor's discriminatory behavior do not satisfy the protected activity requirement when the actions are directed at non-employees. Wimmer v. Suffolk Cty. Police Dep't, 176 F.3d 125, 135 (2d Cir. 1999).

an employee of the museum for Title VII purposes, he may bring this failure-to-hire claim.

Ahmed has not submitted sufficient evidence to satisfy the causation prong of his _prima facie_ case of retaliatory refusal to hire.  Ahmed argues that the temporal proximity between his alleged protected activity at the August 7-11 Tessitura conference and the Museum's August 22 decision not to hire him creates an inference of causation and is circumstantial evidence that the Museum's proffered non-discriminatory reason for not hiring him was pretextual.

Undisputed evidence of intervening events rebut any inference of causation created by the short period of time between the protected activity and the decision not to hire Ahmed.  While Ahmed was informed of the Museum's decision not to hire him only twelve days after the conference at which the protected activity occurred, between those dates the Museum initiated and received the results of Ahmed's background check, which revealed that his stated educational background could not be confirmed.  Young, in the Museum's HR department, had already interviewed Ahmed and she concluded that Ahmed had misrepresented his education.  At that point the normal Museum procedure was to rescind the candidate's job offer.  These events were entirely unrelated to Ahmed's protected activity, and explain why Ahmed was not hired as a Museum employee.

Ahmed argues that Tran manipulated the Museum into deciding not to hire him.  Ahmed's best evidence for this is the series of conversations that occurred between Friday, August 19 and Monday, August 22.  In their initial conversation on August 19 about Ahmed's misrepresentation of his educational background, Montes told Young he still wanted to hire Ahmed.  But, after Montes and Tran spoke with Ahmed later that day, Montes called Young with Tran on the line either that Friday or early the following Monday and told her that he believed the Museum should not hire Ahmed.  After this conversation, Young cancelled the additional HR interviews she had scheduled to determine if Ahmed's job application could be salvaged.  Montes and Tran then informed Ahmed that he would not be hired.

Ahmed speculates that Tran may have said something to Montes in a separate conversation that influenced Montes and caused him to retract his support of Ahmed's job application.  A fact finder may not render a verdict based on speculation.  Speculation is insufficient to permit a rational factfinder to infer a retaliatory motive.  There is no evidence that Montes was influenced by anything other than Ahmed's failure to explain to him the discrepancy between his educational credentials as claimed by him and reported by LIU.  An employer is entitled to set its own standards for employment, see Stern v. Trustees of Columbia Univ. in City of New York, 131 F.3d 305, 313 (2d Cir.

1997), and there can be no dispute that honesty is an entirely
valid, non-discriminatory requirement. This duty of honesty
regarding educational credentials was particularly important
since Ahmed did not even possess the bachelor's degree listed as
a prerequisite for the position.

Ahmed also points to testimony from co-workers about the
strained relationship between Tran and Ahmed as circumstantial
evidence of causation. While Ahmed does present evidence that
others believed Tran did not want Ahmed to receive the job
offer, he puts forward no evidence that Tran's observed
animosity towards Ahmed was due to his protected behavior. In
fact, one co-worker speculated that Tran was trying to derail
Ahmed's job offer because Tran was intimidated by Ahmed's
technical prowess and another claimed to have noticed increased
tension between the two before the conference at which the
protected activity took place. It is unnecessary to resolve,
therefore, what portions of this co-worker testimony would be
admissible at trial.

Finally, Ahmed attempts to show a causal connection by
asserting that he was treated differently from other similarly
situated job candidates who fail a background check because he
was never provided the opportunity to have a post-background
check interview with members of the HR team and generally
because other candidates were hired despite misrepresentations

regarding their education in their application materials.  The parties agree that it is the Museum's practice to examine discrepancies in application materials on a case-by-case basis to determine whether the candidate should be hired.  Ahmed argues that the Museum's August 22 cancellation of his additional HR interviews indicates that the Museum departed from its ordinary practices and treated him more harshly than other candidates who were interviewed multiple times by HR and that this difference in treatment is circumstantial evidence of causation.  While differential treatment can serve as circumstantial evidence of causation, here, Ahmed has not presented evidence that permits a rational fact finder to conclude that he was treated differently than other candidates. The Museum states that when it discovers discrepancies it seeks to determine whether the applicant deliberately lied on their application or, instead, made a good-faith mistake.  It points to examples of at least eight candidates who were not hired since 2012 because their application included discrepancies about educational achievements and asserts that where the Museum ultimately did hire individuals whose applications contained discrepancies, it was after either determining that the individual had a good faith belief that their representation was correct or the applicant corrected the error.  In contrast, the Museum explains that after several discussions with Ahmed

regarding the educational discrepancies on his application and independently calling LIU to attempt to verify Ahmed's education, Young concluded that she "did not believe Mr. Ahmed to be credible." Ahmed has presented no evidence of a similarly situated job applicant who was treated more generously than he. See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

B. Termination of TEK, Inc. Contract

Ahmed's second retaliation claim arises from the termination of the TEK, Inc. contract. Unlike the failure-to-hire claim, Ahmed's claim that his contract was terminated in retaliation for his protected activity depends on whether Ahmed was an employee of the Museum. The parties dispute whether Ahmed was an independent contractor, working through his company TEK, Inc., or a Museum employee and both sides present evidence regarding the manner and circumstances of his work that speak to the thirteen factors articulated by the Supreme Court in Reid. 490 U.S. 730 (1989). See also Knight v. State Univ. of New York at Stony Brook, 880 F.3d 636, 643 (2d Cir. 2018).

Even if Ahmed were able to show that he should be considered a Museum employee, his contract termination claim fails. As with his failure-to-hire claim, the relative temporal proximity between the allegedly protected activity at the August 7-11 conference and the contract termination of September 9 is insufficient to create an

24

inference of causation given intervening events. Ahmed's September 9 call to the Museum's Chief Digital Officer and the security concerns that this telephone call elicited immediately led to the termination of the TEK, Inc. contract. It is undisputed that Ahmed was disturbed in his call to the Officer and that she expressed fear he would damage the Museum's computer system. The undisputed evidence is that Ahmed's heated conversation with the Chief Digital Officer and her concerns regarding security were the cause of the contract termination.

The decision to end TEK, Inc.'s contract was made by Montes after he heard the Chief Digital Officer's security concerns about Ahmed and Ahmed has presented no evidence that either Montes or the Officer knew of his allegedly protected activity. Ahmed has also presented no evidence that Tran played any role in the Museum's decision to terminate the contract. When Montes and Tran told Ahmed on August 23 that he would not be hired, they reiterated that his contract work with the Museum would continue. Here, as in his failure-to-hire claim, any suggestion that Tran improperly influenced the decision to cancel the contract is mere speculation and insufficient to defeat summary judgment.

II. NYCHRL Retaliation Claims

The NYCHRL also makes it unlawful to retaliate against an employee for protected activity. "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik v. Credit Agricole Cheuvreux N.A., Inc., 715 F.3d 102, 112 (2d Cir. 2013). Claims under the NYCHRL must be analyzed "separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent such a construction is reasonably possible." Id. at 109 (citation omitted). Under the NYCHRL, "'opposing any practice' can include situations where a person, before the retaliatory conduct occurred, merely made clear her disapproval of the defendant's discrimination by communicating to him, in substance, that she thought his treatment of the victim was wrong." Id. at 112 (citation omitted).

Under the NYCHRL, "[t]he employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes, as a matter of law, that discrimination played no role in its

actions. Id. at 110 n.8 (citation omitted). "If the plaintiff responds with some evidence that at least one of the reasons proffered by the defendant is false, misleading, or incomplete . . . such evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied." Bennett v. Health Mgt. Sys., Inc., 936 N.Y.S.2d 112, 124 (1st Dep't 2011).

For the reasons discussed above, the defendants' motion for summary judgment should also be granted as to Ahmed's NYCHRL retaliation claims. While the summary judgment standard for NYCHRL claims is more stringent than that for Title VII and the NYSHRL, plaintiffs must still establish a causal connection between the adverse employment action and the protected activity. As described above, Ahmed has failed to present evidence sufficient to permit a rational factfinder to find such a causal connection and so his NYCHRL claims must also fail.

## Conclusion

The defendants' May 2, 2018 motion for summary judgment is granted.

Dated:    New York, New York
          October 9, 2018


_____
                DENISE COTE
        United States District Judge